FILED

04 MAY 18 PM 4: 29

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
MAY 18 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| IN RE: LIBERTY NATIONAL INSURANCE CASES | ) ) ) ) | Master Case Number:<br><br>CV-02-C-2741-2 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| ELLEN GAYLE MOORE, FANNIE W. McCONNELL, and ANITA BOWERS, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>LIBERTY NATIONAL LIFE INSURANCE COMPANY<br><br>    Defendant, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | <br><br><br><br><br><br><br>CV-99-C-3262-S |

### MEMORANDUM OPINION ON CLASS CERTIFICATION

Plaintiffs have moved for certification of these consolidated cases as a class action, pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(2).[1] On due consideration of the

---

[1] The applicable sections of the Rule provide:

**(a) Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to

pleadings, the evidence adduced at the hearing on class action maintainability, and the arguments of counsel, the Court finds and concludes that two of the three named plaintiffs have satisfied all of the requirements of Rule 23(b)(2), and that class certification under this provision is appropriate. [2]

## I. THE CLAIMS OF THE PLAINTIFFS

In their Second Amended Complaint, named Plaintiffs Ellen Gayle Moore, Fannie McConnell, and Anita Bowers contend that Defendant Liberty National Insurance Company ("Liberty National") and its wholly-owned subsidiary, Service Insurance Company of Alabama, violated 42 U.S.C. Sections 1981 and 1982. Plaintiffs allege that Liberty National engaged in a uniform practice of charging higher premiums to blacks than the premiums charged to whites for the same or similar "industrial" and "burial" insurance policies. [3] Plaintiffs also seek to recover

---

the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

**(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
.....

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the class as a whole ....

[2] Documents filed in *Moore v. Liberty National*, will be cited using "Moore Doc.," while documents filed in the master case file, *In Re Liberty National Insurance Cases*, will be cited using "MC Doc."

[3] At the class certification hearing, Liberty National explained the difference between an industrial life policy and a burial policy. "Industrial life policies" are essentially "cash" policies that pay a pre-determined and fixed face value directly to the beneficiary. (MC. Doc. 53, Hr'g

under Alabama state law for breach of contract.

As a remedy, Plaintiffs request "equitable relief, declaratory and/or injunctive relief." (Moore Doc. 108, Second Am. Compl. at p. 26, ¶ B.) They seek to enjoin Liberty National from collecting any discriminatory premiums or paying discriminatory benefits on the policies at issue. Additionally, Plaintiffs ask this Court for a declaration that the industrial and burial policies issued by Liberty National were the products of a pattern and practice of unlawful discriminatory conduct.[4] Plaintiffs also seek "restitution, reformation and attachment, impounding or imposing a constructive trust upon, or otherwise restricting the proceeds of Liberty National's ill-gotten funds ...." (*Id.* at p. 27, ¶ D .) Further, Plaintiffs ask the Court to reform the contracts by disgorging any premium overcharges, plus interest. Plaintiffs also seek specific performance of the contracts on a racially non-discriminatory basis and recovery of reasonable attorney's fees and costs. Finally, Plaintiffs seek punitive damages as a group remedy, in addition to the equitable damages sought under Rule 23(b)(2) ("B2").

In the alternative, Plaintiffs seek punitive damages pursuant to Rule 23(b)(3) ("B3"). However, defendants correctly point out that Plaintiffs did not invoke Rule 23(b)(3) in the Second Amended Complaint. Having failed to rely on B3 in their final pleading, Plaintiffs may not rely on that provision now.

---

Tr. at p. 27.) Burial policies, on the other hand, provide the decedent with "goods" upon death. Liberty National, in conjunction with funeral arrangers, provides the decedent with a casket, burial outfit and other funeral services. (*Id.* at pp. 27-28.)

[4] For ease of reference, the Court will refer to Liberty National and Service Insurance Company of Alabama collectively as "Liberty National," unless otherwise necessary.

## II.  THE PROPOSED CLASS DEFINITION

In their Second Amended Complaint, Plaintiffs sought certification of a B2 class consisting of

> [A]ll African-American persons who have (or had at the time of the Policy's termination) an ownership interest (or beneficiary interest if a death benefit was paid or payable on the Policy) in one or more Industrial Policies issued by Liberty National, and whose Policies were issued and administered based upon the nationwide unconscionable scheme and common course of conduct described herein and who were thereby harmed ....

(Moore Doc. 108, Second Am. Compl. ¶ 6.)

However, by the time the class certification hearing was held, Plaintiffs had re-defined the class to consist of:

> all African-Americans who have (or had at the time of the policy's termination), an ownership interest in an industrial life insurance policy that was issued on a race-based dual rate or dual plan basis.

(MC Doc. 12, Pls.' Mot. for Class Cert.)

Plaintiffs have now limited the scope of the class to those African-Americans whose industrial or burial insurance policies were issued prior to January 1, 1966. (MC Doc. 53, Hr'g Tr. at p. 23.)  Further, the B2 class for which certification is sought would not pursue individual or collective claims for compensatory damages.

## III.  THE FACTS

A.  **Procedural Background**:

On December 8, 1999, the Plaintiffs filed *Moore v. Liberty National* as a putative class action.  Liberty National moved for judgment on the pleadings and on April 7, 2000, this Court

granted the motion. The Court held that Plaintiffs' federal claims were barred by the Alabama two-year statute of limitations for personal injury torts and that said claims could not survive under a fraudulent concealment theory, because the alleged fraud had not been pled with sufficient particularity. In their amended complaint, Plaintiffs cured the deficiencies with respect to the fraud claims. As such, the Court overruled Liberty National's motion for judgment on the pleadings. Subsequently, an interlocutory appeal was taken on the issues of whether Alabama's common law rule of repose bars this action and whether the action is pre-empted by the McCarran-Ferguson Act, 15 U.S.C. Section 1012. The Eleventh Circuit answered both questions in the negative. *See Moore v. Liberty Nat'l Life Ins. Co.,* 267 F.3d 1209 (11th Cir. 2001).

After remand of *Moore*, numerous other lawsuits raising the same issues were filed against Liberty National in this federal district court. Approximately twenty such cases have now been consolidated with *Moore*. The Court has established a Master File Case Number for the consolidated cases and entered a Case Management Order, (*see* MC Doc. 1), under which discovery in the consolidated cases has been deferred pending resolution of the class certification motion.


**B.     Facts Concerning Liberty National's Sale of Insurance**:

Liberty National was created as a fraternal benefit society in 1900. In 1929, Liberty National was converted to a stock company, which was not involved in the sale of industrial or burial insurance. Around this same time, Liberty National acquired the operations of Citizens Life of Huntsville, which sold industrial and burial policies to blacks. In 1932, Liberty National

began introducing its own industrial and burial insurance products, some of which utilized race-distinct pricing.

For example, a Liberty National rate book shows that as of 1932, several insurance plans were restricted to "White Risks Only." For example, white insureds were offered the endowment at 80 policy, while similarly situated blacks were offered an endowment at 79 policy. (MC Doc. 14, Gallagher Decl. ¶ 10.) The differential rates between the two policies resulted in black policyholders paying 36% more in premiums than a white policyholder of the same age. (*Id*.)

Up until the late 1940s, Liberty National sold life insurance policies to both black Americans and white Americans. However, in 1949, it ceased sales of life insurance to blacks. To serve its black market, Liberty National created a wholly-owned subsidiary: Burial Insurance Company of Alabama. Liberty National later changed the name of Burial Insurance Company to Service Insurance Company of Alabama ("Service Insurance").

From 1949 through 1965, Service Insurance sold burial and industrial insurance policies primarily to black Alabamians, while Liberty National continued to sell insurance policies to whites in Alabama and various other states. Liberty National's policy rates were lower than the rates Service Insurance charged for comparable policies.

In a 1988 report to the Texas State Board of Insurance, Liberty National admitted that, until December 1965, the company "used race as a basis for differentiating in life insurance premiums charged." (*See* MC Doc. 14, Ford Decl. at Ex. 4.) The record also reflects that blacks were ineligible for monthly premium payment plans; they instead paid premiums on a weekly basis, thereby paying more money in premiums per month than similarly situated whites.

On January 1, 1966, Service Insurance was merged into Liberty National and became the Service Insurance of Alabama Division of the company. This new "division" offered insurance products under a new two-tiered rate structure utilizing a "standard rate" and a lower cost "preferred rate." Under this new "socioeconomic underwriting" rate structure, Liberty National claims that insurance agents determined whether the standard or preferred rate was charged, by using criteria such as the insured's occupation and other related factors. Inasmuch as Plaintiffs have elected to forego pursuing claims for policies issued after 1965, policies which utilized the so-called socioeconomic underwriting criteria are not at issue in this litigation.

During its history, Liberty National and Service Insurance acquired numerous companies and/or reinsured blocks of insurance business from other companies ("acquired/reinsured companies"). However, most of these acquired/reinsured companies had a principally white insured populace.[5]

Liberty National continued to collect premiums on industrial insurance policies until 1980. In recent years, however, Liberty National has undertaken to remediate the present effects of its overt racially distinct insurance practices. Plaintiffs maintain that these efforts are "too little, too late."

---

[5] In the 1940s, Liberty National acquired Brown Service Life Insurance Company and Brown Service Funeral Association. One of the agencies in the Brown Service family sold insurance principally to blacks. None of the named plaintiffs alleges that she was sold a policy by Brown Service, however.

C.  **Facts Concerning the Named Plaintiffs:**

1.  **Ellen Gayle Moore**

Ellen Gayle Moore ("Plaintiff Moore") is a black citizen of Alabama and a high school graduate. She has lived in DeKalb County, Alabama all of her life.

On November 15, 1954, Plaintiff Moore's mother, Pauline Moore ("Mrs. Moore"), purchased industrial life insurance policy No. 929921 for Plaintiff Moore from Service Insurance. Mrs. Moore is listed as the beneficiary of the policy, which was purchased when Plaintiff Moore was four years old. The policy has a face value of $500. Premiums on the policy were payable for ten years. Mrs. Moore paid the weekly premiums on the policy until Service Insurance deemed the policy to be paid-up as of 1965.[6] Mrs. Moore's premium of $.55 per week was 34% higher than the premium on a policy for a similarly situated white policyholder. Liberty National presents no evidence that Plaintiff Moore was aware of this race-based differential prior to the time this lawsuit was initiated. (*See* MC Doc. 22, Moore Dep. at pp. 112-14.)

In 1985, Mrs. Moore died. There is no evidence that she had any other heirs except Plaintiff Moore.

Plaintiff Moore is reasonably familiar with this case and her responsibilities as a class representative. She will adequately protect the interests of the unnamed members of the class.

---

[6] Liberty National contends that the policy lapsed in 1954 for non-payment of premiums. However, Liberty National's records do not reflect that the policy ever lapsed. All that its records show is a single premium paid in 1954; the records do not show that subsequent premiums were unpaid. Because Liberty National's business records should reasonably be expected to reflect lapses of policies for non-payment of premiums and Liberty National has produced no such records for the policy at issue, the Court infers that the premium payments were made by Mrs. Moore until the policy was paid-up. *See* Fed. R. Evid. 803(7).

There is no evidence of collusion or antagonism between this Plaintiff and the putative class members.

### 2. Fannie McConnell

Plaintiff Fannie Williams McConnell, a black female, has lived in DeKalb County, Alabama all of her life. She graduated from high school in 1947. Fannie McConnell has four children, one of whom, is Anita Bowers, a co-Plaintiff in this action.

Plaintiff McConnell has purchased four Service Insurance policies and she is the beneficiary of three Service Insurance policies owned by her late husband Spencer Williams. Two of the four policies were purchased prior to December 31, 1965: a burial policy she purchased on April 5, 1965, and a burial policy Spencer Williams purchased on the same day, naming McConnell as the beneficiary.

McConnell and her husband paid weekly premiums on the policies. Until shortly before this action was filed, McConnell indicates that she had no reason to suspect that she was paying higher premiums than white policyholders. [7]

Plaintiff McConnell wants restitution and punitive damages for herself and the putative

---

[7]    Q.    Okay. Did any Liberty National agent ever make you feel like you were being discriminated against in any way?

A.    No. I guess they knew how to do it, you know. Because I didn't say anything. They didn't say anything. That is the way I see it. Maybe they didn't intend for me to know.

(MC Doc. 23, McConnell Dep. at p. 74.)

class members.[8]

Plaintiff McConnell is well familiar with this case, its contentions, and its implications. She has no interests antagonistic towards the other class members. There is no evidence of collusion.

### 3. Anita Bowers

Plaintiff Anita Bowers purchased a burial policy issued by Service Insurance on April 5, 1965. This policy was paid up by its own terms in 1980. Sometime later, additional policies were purchased with Bowers as the named insured.

Bowers was unaware of her involvement in this lawsuit until she was notified by a friend who had seen Bowers mentioned in a newspaper article concerning this litigation. (MC Doc. 21, Bowers Dep. at pp. 25-28.)

---

[8]  A.   No, I want the black person to get back the difference that he has already paid on that policy.

Q.   Okay. Meaning the difference between what he paid and what a white person would have paid?

A.   Uh-huh. Uh-huh.

Q.   Any other damages you think you are entitled to in this lawsuit?

A.   No.

Q.   Do you think Liberty National should be punished for anything it did?

A.   Yeah, for doing that.

(McConnell Dep. at pp. 101-2.)

## IV. ANALYSIS

A lawsuit brought as a class action may be certified as such, if the named plaintiffs have standing and satisfy the requirements mandated by Rule 23. In determining whether those requirements are met, the district court must conduct a "rigorous analysis." *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1363 (11th Cir. 1984) (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)). Even so, the district court enjoys "broad discretion" in determining whether to certify a class. *See, e.g., Armstrong v. Martin Marietta Corp.*, 138 F.3d 1374, 1381 (11th Cir. 1998). In actions such as this, it is clear that the plaintiffs have the burden of establishing that they satisfy the requirements of Rule 23. *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000) (citation omitted).

### A.     The Standing Requirement:

Although missing from the express requirements of Rule 23, an implicit requirement is that of standing:

> [A]ny analysis of class certification must begin with the issue of standing.... Thus, the threshold question is whether the named plaintiffs have individual standing, in the constitutional sense, to raise certain issues. Only after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others.

*Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987) (citations omitted). There are three constitutional standing requirements: (1) the plaintiff must allege that she has <u>personally</u> suffered or will suffer an injury, (2) the injury must be fairly traceable to the defendant's conduct, and (3) the plaintiff must show that a favorable court decision will likely redress the injury. *See Wolff v.*

*Cash 4 Titles*, 351 F.3d 1348, 1353 (11th Cir. 2003) (emphasis added).

According to Liberty National, Moore's status as a non-premium paying insured means that she was not a "direct" victim of discrimination and, therefore, she suffered no legally cognizable injury as a result of the race-distinct pricing system. The company relies on three cases in support of this argument. *See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1071-72 (10th Cir. 2002); *Clifton Terrace Assocs., Ltd. v. United Techs. Corp.*, 929 F.2d 714, 721 (D.C. Cir. 1991); *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1354-55 (11th Cir. 2001).

None of these cases is directly on point. These cases merely stand for the unremarkable proposition that only an injured party or "direct victim" may seek redress for alleged violations of 42 U.S.C. Sections 1981, 1982 and other federal statutes. These cases do not, however, answer the question of whether a non-premium paying insured suffers a legally cognizable injury when alleged discriminatory conduct taints the formation and maintenance of the insurance contract.

In this case, Moore stands in her mother's shoes: Moore is the effective beneficiary of the contract at issue. As such, she has the right to cash surrender this paid-up policy at any time. Thus, she has standing to pursue the claims asserted in this action.

Since the named plaintiffs have ownership interests in only such insurance policies as were issued by Liberty National and Service Insurance, Plaintiffs lack standing to represent those unnamed black policyholders who either: (1) purchased policies from companies that were acquired by Liberty National, or (2) purchased policies from companies whose blocks of insurance were reinsured by Liberty National.

The argument that the named plaintiffs lack standing because their claims are untimely goes to the merits of one of Liberty National's principal affirmative defenses. That issue is to be resolved on the merits: either by summary judgment or at trial, but not on a motion for class certification.

The Court finds and concludes that each of the Plaintiffs have the requisite standing to bring this action.

**B.     The Express Requirements of Rule 23(a):**

As alluded to earlier, the proponents of a class action must satisfy the requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. (*See supra* note 1 and accompanying text.)

**1.     Numerosity**

There is no doubt but that the numerosity requirement is met by Plaintiffs, whose numbers exceed the hundreds of thousands. (*See* MC Doc 53, Hr'g Tr. at p. 18.)

**2.     Commonality**

The commonality prong of Rule 23(a) is satisfied where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).[9] These common questions must be

---

[9] A similar concept is found in Rule 23(b)(3), which applies a predominance test: common questions must not only exist, but common questions must "predominate" over any questions affecting individual class members. However, the Rule 23(a)(2) commonality requirement is less stringent than the Rule 23(b)(3) predominance requirement. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997).

substantially related to the resolution of the litigation as a whole. *See In re Alexander Grant & Co. Litig.,* 110 F.R.D. 528, 534 (S.D. Fla. 1986). However, "[c]ommonality is not required on every question raised in a putative class action. *See DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995) (finding commonality where mortgagees with varying mortgage contracts challenged various escrow accounting practices); *Forbush v. J.C. Penney Co., Inc.,* 994 F.2d 1101, 1106 (5th Cir. 1993) (commonality and typicality satisfied in challenge to pension calculations despite presence of four different pension plans). As Liberty National points out in its own brief, Plaintiffs merely need to present evidence that the claims of the class are "susceptible to class-wide proof." *See Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir. 2001).

Liberty National contends that the commonality test is not met here because, *inter alia,* the proposed class involves potentially millions of policyholders who purchased different types of policies, from over fifty-five different companies, based upon different rate books. As an initial matter, this argument is unconvincing because this Court has limited the class to persons who purchased policies from Liberty National and Service Insurance. More importantly, while Liberty National denies the existence of common questions of fact and law in this case, the Court has no hesitance in identifying these questions.

### 3.     Typicality

Rule 23(a)'s typicality requirement "refers to the individual characteristics of the named plaintiff in relation to the class." *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th Cir. 2001). This prong of the Rule is satisfied where the claims of the named plaintiffs "arise from

---

the same event or pattern or practice and are based on the same legal theory" as the claims of the putative class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *see In re American Medical Sys. Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (noting that typicality exists when "a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff.") Put another way, there must be a nexus between the claims of the named plaintiffs and the common questions of fact or law which unite the class.

Liberty National again hypothecates a parade of horribles in the face of the typicality requirement, citing different rate structures, different underwriting companies, and varying levels of remediation. None of these "problems," however, is apposite to the typicality inquiry. The salient fact is that the putative class complains of race-distinct pricing in insurance policies issued by Liberty National and each Plaintiff has an ownership interest in a policy issued by Liberty National or its wholly-owned subsidiary Service Insurance.

Thus, it follows that the typicality requirement has been satisfied by each of the named plaintiffs.

### 4. Adequacy of Representation

Rule 23(a)(4)'s requirement of adequacy of representation has two aspects: (1) adequacy of the named plaintiff, and (2) adequacy of the counsel for the putative class. *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 & 1355 n.11 (11th Cir. 2002). The named plaintiff's adequacy to represent the putative class is established where such plaintiff: (1) has common interests with the unnamed class members, and (2) is committed to vigorously prosecuting the interests of the absent class members through qualified counsel. *Andrews v. AT&T Co.*, 95 F.3d 1014, 1023

(11th Cir. 1996). In addition to the adequacy of the named plaintiffs, class counsel must be competent in the field, and generally able to properly represent the class.

Liberty National challenges the named plaintiffs' adequacy for two reasons. First, Liberty National contends that Plaintiffs waived compensatory damages and, therefore, Plaintiffs do not adequately represent the interests of the putative class. Plaintiffs have not waived compensatory damages for the putative class, however. Instead, they have simply declined to seek such damages in this case. Class members are free to seek such damages in separate lawsuits.[10]

Second, Liberty National argues that the named plaintiffs are not adequate representatives for those plaintiffs with an ownership interest in policies issued by acquired/reinsured companies. As noted earlier, this concern is mooted by the fact that the class will not include persons whose policies were issued by the acquired/reinsured companies.

The Court has carefully reviewed the affidavits and depositions of Plaintiffs and finds that both Ellen Gayle Moore and Fannie W. McConnell have established that they are adequate representatives under Rule 23(a). They are reasonably familiar with the allegations of the complaint, they have submitted to depositions and fully participated in the prosecution of this case, and there is no basis for any assertion that their interests conflict with or are antagonistic to those of the absent class members.

The same cannot be said about Plaintiff Anita Bowers. In her deposition, Bowers

---

[10] An important factor in the named plaintiffs' determination not to seek compensatory damages is that if such damages were sought in this case, Liberty National would surely argue that such damages predominate and, thus, are not incidental to the relief sought under B2. Liberty National would also contend that claims for compensatory damages would result in a plethora of individual rather than common questions, thereby precluding certification under B2.

testified that she never gave permission for her name to be used in this lawsuit. She only learned that she was a named Plaintiff <u>after</u> the lawsuit was filed. (MC Doc. 21, Bowers Dep. at pp. 25-28). In the absence of a showing that Bowers has agreed to serve as a class representative, she cannot be certified as such. Accordingly, the Court finds that Mrs. Bowers is not an adequate class representative.

Liberty National does not challenge the adequacy of Plaintiffs' counsel, many of whom have extensive experience handling class actions.

### C.    The Requirements of Rule 23(b)(2):

As noted earlier, the named plaintiffs herein have chosen to ride the Rule 23(b)(2) horse in this lawsuit. An action is appropriate for certification under B2 if the defendant's policies and conduct affect the entire class; as such, equitable relief must predominate in a B2 action; any monetary relief must be incidental to the injunctive or declaratory relief sought. *See Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001).

In *Murray v. Auslander,* the Eleventh Circuit looked to and cited the Fifth Circuit for guidance in establishing the criteria for determining when monetary damages are incidental in a B2 case:

> By incidental, we mean damages that flow directly from liability to the class <u>as a whole</u> on the claims forming the basis of the injunctive or declaratory relief. Ideally, incidental damages should be only those to which class members automatically would be entitled once liability to the class (or subclass) as a whole is established. Liability for incidental damages should not entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions.

244 F.3d at 812 (emphasis in original) (citing *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402,

415 (5th Cir. 1998)). To establish a viable B2 claim, monetary relief must be "capable of computation by means of objective standards and not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415.

Plaintiffs seek equitable relief in the form of an injunction preventing Liberty National from henceforth paying benefits at lower rates than Plaintiffs would have been entitled to receive had they been white when the policies were issued. Plaintiffs also seek restitution, reformation of their contracts, the imposition of a constructive trust, and disgorgement of premium overcharges, plus interest. In other words, Plaintiffs seek specific performance of their insurance contracts on a racially non-discriminatory basis.

For the quintessentially equitable relief sought by Plaintiffs, it is of no moment that the insurance policies are no longer in premium-paying status.

Moreover, while the relief sought by Plaintiffs has a monetary component, the relief in this action can be calculated "by means of objective standards and is not dependent in any significant way on the intangible, subjective differences of each class member's circumstances." *Allison*, 151 F.3d at 415. According to Plaintiffs' expert Vincent Patrick Gallagher, "[r]elief [in this action] can be implemented, as applicable, on a <u>classwide</u> basis by utilizing methodologies widely accepted in the field of actuarial science ...."[11] (MC Doc. 14, Gallagher Decl. ¶¶ 29, 31-

---

[11] Dr .Gallagher explains:

> For in-force policies, relief to correct for differences in policy benefits can be provided by reforming those policies to eliminate the discriminatory features and increase the policy benefits to non-racially discriminatory levels. These benefits can be determined on the basis of existing information. This is accomplished by calculating the ratio of the discriminatory African-American premium to the Caucasian premium

32; *see id.* ¶ 6) (emphasis added).

Plaintiffs have carried their B2 burden of establishing that Liberty National has acted on grounds generally applicable to the class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

## V. CONCLUSION

The Court finds that named Plaintiff Anita Bowers does not satisfy the Rule 23(a)

---

and multiplying the discriminatory face amount of the policy by this ratio.

....

To correct for the discriminatorily-priced policies, premium overcharges can be refunded or policy benefits can be increased in accordance with the amount of price discrimination. It is possible to calculate these amounts for each individual policy. These per policy amounts can be grouped into plan and issue age cells and applied to the actual policies shown on the database obtained through discovery from Liberty National in this action. The database includes policies issued in the 1930s and includes plan codes, company codes, insurance amounts and premium amounts.... [I]t is possible to calculate these amounts for each class member by determining the amount of overcharge/insufficient policy benefit and applying this amount to the premiums paid or policy benefits received or to be received.

The uniform methods of providing the relevant types of injunctive relief and the equitable refunds can be expressed in tables of factors that are applied to each policy (grouped by plan code) determined to be racially discriminatory. These tables, or grids, are simple arithmetic devices that can be directly applied to defined categories or policies to provide relief. The factors in the grids will be applied manually or within each defendant's computer systems to calculate and record individually the relief.

(MC Doc. 14, Gallagher Decl. ¶¶ 29, 31-32; *see id.* ¶ 6.)

adequacy requirement. At the same time, the Court finds that named Plaintiffs Ellen Gayle Moore and Fannie W. McConnell meet all of the requirements of Rule 23(a) and the requirements of Rule 23(b)(2). Accordingly, this action will be certified as a class action by separate order.

Done this 18th day of May, 2004.

                                                 Chief United States District Judge
                                                 U W Clemon